UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RAHIM HARVALL,

                Petitioner,

                -against-

WILLIAM PHILLIPS, Superintendent,
Green Haven Correctional Facility,

                Respondent.
-------------------------------------------------------------x

**MEMORANDUM AND ORDER**

03-CV-2968 (DLI)

**DORA L. IRIZARRY, U.S. District Judge:**

      Rahim Harvall ("Petitioner") was convicted in New York State Supreme Court, Queens County, of murder in the second degree and criminal possession of a weapon in the third degree on December 16, 1999. The Appellate Division, Second Department, affirmed Petitioner's conviction on December 10, 2001. *People v. Harvall*, 289 A.D.2d 340 (2d Dep't 2001). The Court of Appeals denied Petitioner's application for leave to appeal on March 27, 2002. *People v. Harvall*, 97 N.Y.2d 755 (2002). Petitioner challenges his conviction, pursuant to 28 U.S.C. § 2254, on the grounds that his constitutional rights were violated by (1) the Prosecution's late disclosure of exculpatory evidence in violation of *Brady v. Maryland*—that a witness (Janetta Daniels) heard another individual, Sean Pearson, confess to the crime, and (2) the court's refusal to grant Petitioner a continuance so that he could investigate the new evidence, thereby violating his rights to present a defense, to call witnesses, and to due process. For the reasons set forth below, the petition is denied.

1

**I.   Facts**

The incident underlying this petition is the murder of Raymond Johnson, which occurred around midnight the evening of April 3, 1998. When Police Officer Jason Wolfson approached the crime scene on Rockaway Avenue in Brooklyn, he found Koson Miller, the son of Johnson's fiancée, Linda Emery, cradling Johnson, who had been shot in the head. Another of Johnson's friends, Jeffrey Fargas, had alerted Officer Wolfson to the shooting. Neither Miller nor Fargas mentioned anything about defendant Harvall to Officer Wolfson at this time. (Tr. at 438–39.) The two eyewitnesses, Fargas and Miller, testified as to the shooting and events occurring earlier that day.

Miller was walking about six feet behind Johnson and Fargas when Johnson was shot. Miller testified he did not see the shooter's face until after the shooting, when the shooter had walked past him and was about six feet away. Miller said he had seen this person three times around his mother's building in the month prior to the shooting but had not known his name. On November 4, 1999, a year and a half after the murder, police showed Miller a line-up of six people, whose bodies were covered by a sheet so that only their heads were visible, but he did not identify anyone in the line-up.

Jeffrey Fargas testified he had known Harvall for approximately fifteen years. Earlier in the evening of April 3, 1998, Johnson told Fargas that he had gotten into an argument with Harvall. Fargas sought out Harvall and spoke to him about the altercation. Harvall was wearing blue jeans and a jean jacket with a Tommy Hilfiger label on the back. Shortly afterwards, in Fargas' presence, Johnson confronted Harvall about the previous altercation. Harvall tried to cut Johnson with a razor and Fargas broke up the fight, which occurred in the lobby of Linda Emery's building. Harvall then said, "You see, now I'm gonna have to handle this. I'm gonna have to kill him." (Tr. at 685.) After

2

Fargas and Johnson went upstairs to Ms. Emery's apartment, Fargas descended to speak to Harvall again. At that point, Harvall said, "Don't have him near you 'cause if he's near you, I'm gonna kill him. Don't have him around you. I'm gonna kill him." (Tr. at 688.)

Around the same time Fargas was speaking to Harvall, Johnson and Miller left Linda Emery's residence to go to a Chinese restaurant. Ms. Emery testified that, shortly after Johnson and her son left, Harvall knocked on her door asking for Jeffrey Fargas. Ms. Emery knew Harvall from mutual friends and attending Harvall's son's baby shower a few years before. She testified he was wearing a jean jacket and jeans. Miller also testified that, upon exiting his mother's building, Johnson had pointed out an individual wearing blue jeans and a Tommy Hilfiger denim jacket and called this individual "Fat Cat," which was Rahim Harvall's street name.

After speaking to Harvall, Fargas met up with Johnson and Miller as they were returning from the nearby Chinese restaurant. He testified that he saw Harvall shoot Johnson in the face. He also saw Harvall walking away from the scene of the crime, wearing the jean jacket with the Tommy Hilfiger logo that he had seen on Harvall earlier that evening. Fargas was uncooperative with the police at first, and he refused to talk to them just after Johnson was shot, but he gave the police a full report the evening of April 4, 1998.

Detective Dennis Ciano, the lead detective investigating the crime for which Petitioner was convicted, testified at trial that he interviewed both Fargas and Miller in connection with Johnson's murder. Detective Ciano interviewed Fargas twice on April 4, 1998 and by the next day had targeted Rahim Harvall, also known as "Fat Cat," as a suspect. Both witnesses identified Harvall as the perpetrator.

On the evening of April 15, 1999, New York City Police Officer Michael Schmalix, of the

Emergency Service unit, and his partner were called to a multi-dwelling apartment complex on Essex Avenue in Brooklyn. When they arrived, several detectives told them a rape suspect and a homicide suspect, later identified as Sean Pearson and Petitioner Rahim Harvall, respectively, were inside behind a locked door. After around thirty or forty-five minutes, Pearson opened the door. Officer Schmalix entered the apartment, whereupon Harvall said, "Don't come any closer, I have a gun, I'll shoot myself." (Tr. at 520.) Harvall put the gun to his head and pulled the trigger, but the gun misfired. Harvall fired a second shot, and Officer Schmalix saw a pool of blood and Harvall become limp. Both Pearson and Harvall were arrested.

The prosecutor and defendant stipulated "that, based on the available evidence there [was] no way to scientifically prove or disprove whether or not [the gun recovered from Harvall] was the gun that shot . . . . the rounds that killed Raymond Johnson." (Tr. at 654–55.)

On April 15, 1998, before Harvall's arrest, Detective Ciano interviewed Janetta Daniels, the victim of an unrelated rape case, who revealed that the man who allegedly raped her, Sean Pearson, told her he was hiding Harvall and preparing to move him to Virginia. Detective Ciano took handwritten notes during this conversation, which, on objection, were not admitted into evidence. Daniels reported to Detective Ciano that Pearson had confessed to Johnson's murder but retracted his confession in the same conversation with her. She told Detective Ciano that Pearson had raped her after she told Linda Emery what he had said. According to Detective Ciano, although he did not record the exact words regarding the retraction, his notes about "Fat Cat" being driven away conveyed the retraction. Based on his interview of Daniels, Detective Ciano testified that his main interest was "[f]inding Rahim Harvall before they took him to Virginia." (Tr. at 602.)

Miller, who was around twenty-six years old at the time of the shooting, testified that he had

4

known Sean Pearson since the age of twelve or thirteen, when Pearson, who was older than Miller, used to beat him up. Miller had contact with Pearson on a daily basis since then and testified that Pearson was not Johnson's shooter and that he did not see Pearson anywhere in the vicinity of Rockaway Avenue on the night Johnson was shot.

The prosecutor first revealed the information about Detective Ciano's interview with Daniels on November 8, 1999, when he turned over the Detective's handwritten notes in *Rosario* material. (Hr'g at 5, 72.)[1] The notes did not contain Daniels' name, and defense counsel claims not to have received this information until November 12, 1999. (Pet'r Mem. at 7.) Also included in the *Rosario* material was a complaint / follow-up report (or "DD-5") containing Daniels' account of the rape but not disclosing her name. (Pet'r Ex. G.)

On November 15, 1999, defense counsel brought this issue to the trial judge's attention during a suppression hearing. Defense counsel reported that Daniels' address was incorrect, and the court inquired several times regarding the prosecution's efforts to locate Daniels (Hr'g at 72, 113, 122–23, 136.) After Detective Ciano's testimony at the hearing on November 15, 1999, defense counsel asked the court to dismiss the indictment or postpone the trial and offered the following arguments: "[I]t becomes very clear after listening to this detective that [there was a] Brady violation by the failure of the People to disclose to me the name and location of a witness who had favorable information to the defense, where you have another individual who has admitted to committing this crime." (Hr'g at 124.) Rather than responding to this argument, the prosecutor steered the court to the issues at the hearing. (*Id*. at 126.) After ruling on the suppression hearing issue, the court

---

[1] The cover sheet for the *Rosario* material is dated November 9, 1999 but appears to have been handed over on November 8. (Hr'g at 5.)

5

refused to dismiss the case. (*Id*. at 136.)

On November 17, 1999, at a sidebar during opening statements, defense counsel told the court that his private investigator had been unable to locate Daniels and renewed his request for a continuance, which the court denied. (Tr. at 407.) Later that day, defense counsel again unsuccessfully requested "an adjournment pending the resolution of the Brady violation issue." (*Id*. at 541.) The trial court stated:

> [The prosecution] has been making, I believe, diligent efforts to locate [Daniels] on behalf of both the People and the defense, and as has already been pointed out, [defense counsel has] had the information for now a week and a half . . . and efforts have been made. I believe that any further delay is not necessary or appropriate and I'm denying . . . a continuance because [defense counsel has] had a continuance in effect from the eighth to the 17th of November.

(*Id*.) On November 18, 1999, the second day of trial, before the close of the prosecutor's case, the prosecutor provided defense counsel and the court with Daniels' correct address. (*Id*. at 662.) The following day, defense counsel reported to the court that Daniels was not home when his private investigator attempted to reach her. (*Id*. at 664.) Petitioner rested without calling any witnesses or requesting a further continuance from the court.

The trial court told the prosecutor and defense counsel that "extensive hearsay evidence" was presented to the jury because of the prosecution's "failure to disclose some potentially exculpatory information in a timely fashion." (Tr. at 659.) The judge instructed the jurors that the testimony regarding Detective Ciano's conversation with Daniels was hearsay not admissible for its truth and only admissible to show his state of mind. In response to a note the jury sent regarding hearsay testimony, the court repeated this instruction to the jury. Petitioner's last request in reference to the alleged *Brady* violation was a motion, made during jury deliberations after the jury's question

6

regarding hearsay testimony, to dismiss the indictment. The court denied this motion.

## II. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In reviewing the state court decision, "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. Alleged *Brady* Violation

Petitioner argues that his writ of habeas corpus should be granted because the prosecution failed to disclose exculpatory material in a timely manner and thus violated Petitioner's rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Under *Brady*, it is the prosecution's constitutional duty to disclose to the defendant any exculpatory evidence or evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citing *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)). The duty to disclose is affirmative, and the prosecutor must turn over favorable evidence even if

7

defense counsel has not requested it. *Leka v. Portuondo*, 257 F.3d 89, 99–100 (2d Cir. 2001). The Supreme Court has held: "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).

Evidence has been suppressed where it is not disclosed in time for the defendant to make proper use of it. *See Leka*, 257 F.3d at 100 (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."); *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) ("*Brady* material must be disclosed in time for its effective use at trial."). Although there is no express timing requirement, it cannot be ignored that "the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use." *Leka*, 257 F.3d at 100.

With regard to showing prejudice, "[t]he suppression of exculpatory or impeaching evidence does not constitute a constitutional violation unless the evidence is 'material.'" *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002). In assessing materiality, the standard articulated by the Supreme Court is "a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 678, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable

probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* (quoting *Bagley*, 473 U.S. at 678). Admissibility also affects materiality, but the court need only be satisfied that the item of evidence in question is admissible, at least in part, or that it could lead to admissible evidence. *Gil*, 297 F.3d at 104.

Here, there is no doubt that Pearson's alleged statements confessing to Johnson's murder would have been "favorable to the accused," despite the fact that there was also evidence that Pearson had retracted the confession. Nevertheless, Petitioner must also show that the evidence was suppressed and that, had it not been suppressed, there would have been a "reasonable probability of a different result."

Petitioner relies heavily on *Leka v. Portuondo* for his contention that the prosecution's late disclosure of Daniels' testimony constituted a *Brady* violation. 257 F.3d 89. In the *Leka* case, a man and his fiancée walking down a street in Brooklyn heard shots fired and sought refuge behind a parked car. A few minutes prior to the shooting, the woman had seen someone in the passenger's seat of a light-colored, parked car, whom she identified as Leka. The man saw an arm firing a shot at the victim from the passenger window of a light-colored car and said he then saw Leka shooting downward at the victim in the street. Three days prior to trial, the prosecution disclosed the name of another individual who had witnessed the shooting, an off-duty police officer, but did not indicate that this officer's testimony was favorable to the defense.[2] The police officer's account would have shown that defendant Leka was not the person seen shooting at the victim in the street. Consistent

---

[2] The prosecution also failed to notify the defense of two other witnesses. However, on appeal, the Second Circuit based its decision solely on the non-disclosure of information relating to the police officer. *Leka*, 257 F.3d at 98.

9

with this theory, when shown a picture of the victim after the trial, the man who testified he saw Leka shooting in the street conceded that the shooter he had seen in the street was the victim rather than Leka.

In *Leka*, the prosecution had sought a protective order on behalf of the police officer witness after the defense counsel's private investigator had used deceptive tactics to obtain his telephone number. The trial court then barred the defense from contacting the police officer, and neither side called him to testify. In finding that evidence favorable to the accused had been suppressed, the district court remarked: "[T]he prosecution is in no position to fault the defense for cutting corners when the prosecution itself created the hasty and disorderly conditions under which the defense was forced to conduct its essential business." *Leka*, 257 F.3d at 101.

The court agrees with Petitioner that Daniels' testimony was suppressed. As in *Leka*, even though Petitioner had Daniels' name three days before the start of trial, he cannot be faulted for not being able to locate Daniels in time for her to testify at his trial, when her correct address was not obtained until the second day of trial. Although the jury heard the substance of Daniels' conversation with Pearson, they were instructed several times that they could only consider this testimony to show Detective Ciano's state of mind. Defense counsel may have been able to make some use of Pearson's statements as introduced at trial—for example, through argument and cross-examination of Detective Ciano, whose testimony was subject to limiting instructions—but this was not an *effective* use, as Petitioner did not have an opportunity for full investigation of the information and potential witnesses.[3] *See Coppa*, 267 F.3d at 135.

---

[3] The Appellate Division, Second Department, concluded Daniels' testimony had not been suppressed but still found that the outcome at trial would not have been affected by an earlier disclosure. As this court finds any suppression immaterial, there is no disagreement with the Second

Nevertheless, with regard to showing prejudice, the instant case is distinguishable from *Leka* because the evidence against Harvall was much more substantial. The two witnesses who testified at trial in *Leka* were strangers to all the parties involved. Only one witness said he saw Leka shooting at the victim in the street. The eyewitness testimony in the present case is significantly stronger than in *Leka*, where mistake of identity was a very real possibility and there was no corroboration. Here, Fargas testified to knowing Harvall for fifteen years and saw him shoot Johnson from inches away. Miller testified he knew Pearson for around thirteen years and that Pearson was not the shooter. Harvall had been in at least two arguments with Johnson earlier that day and had threatened to kill him. Moreover, Fargas, Miller, and Ms. Emery all saw Harvall wearing blue jeans and a jean jacket, and Miller and Fargas both testified that the jacket had a Tommy Hilfiger logo on the back.[4] These witnesses saw Harvall in this attire several times the day of the shooting, and Fargas and Miller also saw the shooter wearing this clothing when Johnson was shot. There were no witnesses who reported anything that contradicted the events of April 3, 1998 as reported by Ms. Emery, Fargas, and Miller.

Additionally, even if Daniels had been available to testify, Pearson's statements would have been hearsay not admissible for their truth. Petitioner argues that Daniels' testimony as to Pearson's alleged confession would have been admissible as a declaration against penal interest, an exception to the hearsay rule. New York law recognizes this exception on the assumption that an individual

---

Department's ultimate finding. In denying the petition, the court thus gives appropriate deference to the state court under AEDPA, since the Second Department's decision was not "contrary to," or did not involve "an reasonable application of, clearly established Federal law."

[4] Ms. Emery did not specify that the jacket had a Tommy Hilfiger logo. Since she testified that Harvall came to her door, it is entirely possible that she never saw the back of his jacket.

11

is generally unlikely to fabricate an admission to criminal wrongdoing. *See e.g.*, *People v. Settles*, 385 N.E.2d 612, 619 (N.Y. Ct. App. 1978). However, as a safeguard to the inherent unreliability of hearsay statements, a declaration against penal interest must satisfy several elements to be admissible:

> first, the declarant must be unavailable as a witness at trial; second, when the statement was made the declarant must be aware that it was adverse to his penal interest; third, the declarant must have competent knowledge of the facts underlying the statement; and, fourth, and most important, supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability.

*Id*. (citations omitted); *see also People v. Smith*, 606 N.Y.S.2d 656 (1st Dep't 1994).

As to the first element, the parties never discussed locating Sean Pearson even though, presumably, since Harvall had been hiding with Pearson, he might have known of his whereabouts. The defense's focus was exclusively on finding Daniels, and it was never stated that Pearson was unavailable. However, even assuming unavailability, that Pearson was aware his statement to Daniels was adverse to his penal interest, and that Pearson had "competent knowledge of the facts underlying the statement,"[5] the last element required for admissibility of the confession is weak. There is insufficient evidence "independent of the statement itself" to corroborate Pearson's alleged incriminating statements. Admittedly, Pearson's alleged rape of Daniels occurred after she told Ms. Emery about Pearson's statements. Although this could be viewed as retaliation for sharing a confession, it could also be viewed as retaliation for spreading a rumor if Pearson had also retracted

---

[5] This third element, if met at all, is merely established on a superficial level. Pearson's alleged confession did not contain any detail about the scene of the crime and there is no evidence that Pearson observed the shooting or was in the area where the shooting occurred. Both Miller and Fargas, who knew Pearson, testified that they did not see him on the day Johnson was shot. Therefore, the only evidence indicating that he may have known "the facts underlying the statement" is his supposed involvement in hiding Harvall.

12

the confession, as indicated by Detective Ciano.

Speculation about these circumstances is insufficient to override the lack of corroboration, which is evident by the fact that there was no eyewitness or physical evidence connecting Pearson to the crime and that the alleged confession was not especially detailed. *Cf. Smith*, 606 N.Y.S.2d at 662–64 (confession corroborated where eyewitness saw declarant at the scene of the crime, victim sought whereabouts of declarant on several occasions, and declarant had been seen often on the street corner where victim was killed); *People v. Washington*, 488 N.Y.S.2d 615 (2d Dep't 1984) ("confession included information that only a participant in the crime would have known, i.e., that a corrections officer was one of the victims and that the officer's gun and shield had been taken during the robbery"). The only connection the defense attempted to make between Pearson and the scene of the crime was the weak argument that Harvall and Pearson were of a similar height and weight.

Moreover, Detective Ciano testified that Daniels told him Pearson had retracted the confession. Detective Ciano gave a plausible explanation for his failure to take exact notes as to Pearson's retraction of the confession: once Detective Ciano heard that Pearson was going to take Harvall to Virginia, his main concern was trying to find where Pearson and Harvall were hiding. And indeed, Harvall was arrested the same day Detective Ciano interviewed Janetta Daniels.

Given the lack of independent corroboration, it is unlikely that the trial court would have admitted Daniels' testimony regarding Pearson's statements under a hearsay exception, which supports a finding that the late disclosure of Pearson's alleged confession to Daniels did not prejudice Petitioner. The evidence in the record—uncontradicted eyewitness testimony and other corroborating evidence showing that Harvall shot Johnson—reinforces the conclusion that, despite

13

the suppression of Daniels' testimony, there is no "reasonable probability of a different result." Therefore, the suppression of Daniels' testimony does not "undermine[] confidence in the outcome at trial" and Petitioner is not entitled to prevail on a *Brady* violation theory.

IV. Alleged Violation of Petitioner's Sixth Amendment Rights[6]

Petitioner alleges that his right to present a defense was violated by the trial court's refusal to grant him a continuance to locate Daniels so that she could testify. Under the Sixth Amendment, the accused has a right "to have compulsory process for obtaining witnesses in his favor." Although the Appellate Division, Second Department, did not comment on this particular claim, in reducing its disposition to judgment, the state court adjudicated the claim on the merits for purposes of AEDPA. *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002).[7] As with the previous claim, the court does not find that the state court's denial of the petition was "contrary to, or involved an unreasonable application of, clearly established Federal law."

"Under New York law, the granting of an adjournment for any purpose is a matter of discretion for the trial court." *Perez v. Keane*, 1996 WL 599695, at *3 (S.D.N.Y.) (citing *People v. Singleton*, 41 N.Y.2d 402 (1977)). Nevertheless, a trial court's unreasonable or arbitrary denial of a continuance is an abuse of this discretion. *See Drake v. Portuondo*, 321 F.3d 338, 344 (2d Cir.

---

[6] Petitioner raised this argument in his brief to the Appellate Division, Second Department. Although the Second Department did not mention this claim in its decision denying the petition, the exhaustion requirement has been satisfied and this court may adjudicate the claim on the merits. *See Seifert v. Keane*, 74 F. Supp. 2d 199, 204 (E.D.N.Y. 1999).

[7] "A state court 'adjudicates' a petitioner's federal constitutional claims 'on the merits' when 'it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment." *Id.* (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)).

2002); *Marino v. Miller*, 2002 WL 2003211 (E.D.N.Y.). The trial court denied Harvall's several requests for a continuance, knowing that diligent efforts were being made by both sides to locate Daniels and opining that a week was sufficient time for this task. This court does not find this decision unreasonable, especially since, after obtaining Daniels' correct address, the defense made no further requests for a continuance. As Respondent points out, it is entirely possible that the trial court would have reconsidered its previous denials at this point.

Whether or not the trial court acted arbitrarily, Petitioner would still have to show that the error was not harmless. The Second Circuit has not yet ruled which harmless error standard applies post-AEDPA: (1) "whether the error had substantial and injurious effect or influence in determining the jury's verdict" under *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710 (1993) (internal quotation marks omitted), or (2) pursuant to 28 U.S.C. § 2254(d), whether the state court's ruling was "contrary to, or involved an unreasonable application of" the "harmless beyond a reasonable doubt" standard under *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *See, e.g.*, *Benn v. Greiner*, 2005 WL 545025 (2d Cir. 2005); *Brown v. Keane*, 355 F.3d 82, 91 (2d Cir. 2004) (both cases declining to determine this open question).

The Appellate Division, Second Department, in commenting only on Petitioner's *Brady* claim, found "no basis for concluding that an earlier disclosure [of Pearson's statements] would have affected the outcome of the trial." Using either the *Brecht* or the post-AEDPA *Chapman* standard, this court finds that any error in refusing to grant a continuance was harmless. As discussed above, the evidence against Harvall was more than "weighty" in satisfaction of the *Brecht* standard, as there was no evidence submitted to contradict the events as reported by the two eyewitnesses. *See, e.g.*, *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir. 1996); *Bennett v. Artuz*, 285 F. Supp. 2d 305, 313

15

(E.D.N.Y. 2003). The uncontradicted evidence against Harvall, in addition to the likelihood that Daniels' report of Pearson's statements, without corroboration, would not have been admissible for their truth as a declaration against penal interest, supports this court's conclusion of harmless error.

**V. Conclusion**

For the reasons set forth above, Rahim Harvall's petition for a writ of habeas corpus is denied. Petitioner further is denied a certificate of appealability as he fails to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

DATED: Brooklyn, New York
August 30, 2005

_____/s/_____
DORA L. IRIZARRY
United States District Judge_____